**FILED**
**Feb 14, 2019**
**12:48 PM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# IN THE COURT OF WORKERS' COMPENSATION CLAIMS
# AT JACKSON

| | | |
|---|---|---|
| **JEANIE L. CHAMBERLAIN,** | ) | **Docket No. 2018-07-0418** |
| **Employee,** | ) | |
| **v.** | ) | |
| **CRACKER BARREL OLD COUUNTRY** | ) | **State File No. 56529-2017** |
| **STORE, INC.,** | ) | |
| **Employer,** | ) | **Judge Amber E. Luttrell** |

## EXPEDITED HEARING ORDER DENYING REQUESTED BENEFITS

The Court held an Expedited Hearing on January 22, 2019, on Jeanie Chamberlain's request for medical and temporary disability benefits for a stroke allegedly caused by her employment. The central legal issue is whether Ms. Chamberlain is likely to prevail at a hearing on the merits in establishing her right to these benefits. For the reasons below, the Court holds Ms. Chamberlain is not likely to prevail and denies her request.

### History of Claim

Ms. Chamberlain works for Cracker Barrel as a retail associate. She suffered a stroke on July 1, 2017, and alleged it arose out of a stressful conversation with management on that date.

She testified to the following events precipitating her stroke. While working on July 1, an African-American coworker told Ms. Chamberlain she was not going to do her side-work because another Caucasian coworker did not have to do her side-work.[1] The African-American coworker then said, "I guess that makes me a racist."

Ms. Chamberlain reported the comment to her direct retail manager, Vicki Whittington to pass the information on to the coworker's supervisor and restaurant manager, Craig Ricketts. The parties agreed it was a common occurrence for Ms. Chamberlain to report the behaviors of her coworkers to management. Ms. Chamberlain

---

[1] The Court notes the parties did not define "side-work" at the hearing. In context, the Court interpreted it to mean extra work duties.

stated she was in a coaching position at the time and felt it was her responsibility to make managers aware of things that happened.

Mr. Ricketts was unavailable; therefore, Ms. Chamberlain and Ms. Whittington met Kristina Williquette, another store manager, in the stockroom to share Ms. Chamberlain's concerns. The parties provided slightly different accounts of this conversation. However, everyone agreed the conversation lasted less than five-minutes and was a normal conversation in that everyone spoke in a normal tone of voice; there was no yelling and no quarrel.

According to Ms. Chamberlain, before relaying what she heard, she and Ms. Williquette agreed that her name would be "left out of it." However, when she shared her coworker's comments, Ms. Williquette responded that Cracker Barrel takes alleged racial concerns very seriously, and they would need to complete a report to send to the home office. Ms. Chamberlain stated they discussed the fact that she had promised to leave her name out of it and after the discussion, Ms. Williquette left the stockroom to return to work. Ms. Chamberlain stated she felt "betrayed" by Ms. Williquette for going back on her promise to leave her name out of it.

Ms. Whittington and Ms. Williquette's testimony differed regarding what was said about the necessity of preparing a report. Ms. Williquette testified by affidavit that she agreed to keep Ms. Chamberlain's name out of it before she described the incident. However, when Ms. Chamberlain described it as racial in nature, Ms. Williquette stated she would need to fill out a statement if she wanted to report the complaint because Cracker Barrel takes racial concerns very seriously. Ms. Williquette advised her to consider whether the incident was truly racial in nature and whether she wanted to pursue a written report. Ms. Williquette then returned to work.

Ms. Whittington testified consistently with Ms. Williquette regarding the conversation and stated that after Ms. Williquette left the stockroom, Ms. Chamberlain told her she did not want to prepare a report. Ms. Whittington reassured Ms. Chamberlain that she did not consider the comment to be racial in nature and that Ms. Chamberlain did not have to complete a report. They both returned to work. Both Ms. Williquette and Ms. Whittington testified that during the brief conversation, Ms. Chamberlain did not appear distressed or upset. Ms. Whittington stated she spoke in a normal tone of voice, did not cry, was not perspiring, her face was not red, she was breathing normally, and she did not appear unusually anxious.

Following the conversation, Ms. Chamberlain began stocking shelves with merchandise in the stockroom. Approximately ten to fifteen minutes later, she experienced numbness spreading through the right side of her face and told Ms. Whittington she did not feel well. She then experienced symptoms down her right arm and asked Ms. Whittington to call an ambulance. She believed she was having a stroke.

2

*Medical treatment*

Ms. Chamberlain sought treatment at the hospital emergency room where she had markedly elevated blood pressure of 212/147. Following a CT scan, Dr. Sumathira Sathanandan, a neurologist, diagnosed a left thalamic hemorrhage related to hypertensive crisis. She noted, "hypertensive crisis in that this patient did not take her medications last night or this morning."

Ms. Chamberlain saw several different physicians and/or specialists in the hospital who noted slightly different histories regarding the onset of her symptoms. Dr. Michael Revelle's ER note indicated Ms. Chamberlain stated her symptoms began "in an argument with someone at work." She also reported to him that she failed to take her blood pressure medication that day and the night before.

Dr. Sathanandan noted Ms. Chamberlain stated she "forgot to take her medications including her antihypertensives last night and this morning." She further noted that Ms. Chamberlain stated her symptoms began following an upsetting discussion with her supervisor at work regarding some "issues going on at work."

Dr. Davidson Curwen, a rehabilitation physician, noted Ms. Chamberlain's history of hypertension and diabetes. He also stated she forgot to take her blood pressure medication and noted her symptoms started shortly after an argument with a coworker.

Ms. Chamberlain disputed the accuracy of the physicians' histories in her hospital records. First, she stated she did not tell physicians there was a quarrel or argument. Secondly, she testified she did not tell physicians that she failed to take her blood pressure medication that day or the night before. In support of this argument, Ms. Chamberlain noted that upon reviewing her hospital records, she completed a "Request for Amendment of Health Information" form to correct her ER record history. (Ex. 3.) On the form, she indicated that when she arrived at the ER on July 1, "I could talk, but what I was thinking was different than what I said." She stated her medical records and Dr. Sathanandan's consultation record were incorrect when they said she did not take her blood pressure medication that day and the night before. She explained that she was trying to say she did take her medication. However, Ms. Chamberlain did not mention or correct the reported history of an argument on the form. On cross-examination, she stated her focus was correcting the medication error.

Ms. Chamberlain spent one week in the neuro-intensive unit and then transferred to inpatient rehabilitation through July. Although Cracker Barrel knew of Ms. Chamberlain's stroke and treatment, it denied she provided notice of a work-related injury until June or July of 2018.

Regarding notice, Ms. Whittington testified Ms. Chamberlain received training in

3

safety meetings concerning how to report work injuries. Further, Ms. Whittington visited Ms. Chamberlain twice in the hospital, and she never associated her stroke with work. Ms. Whittington spoke to her regarding FMLA, and she never requested workers' compensation benefits. Ms. Whittington first learned Ms. Chamberlain alleged a work injury in June or July 2018, after she filed her PBD. Had she reported a work injury, Ms. Whittington testified she would have completed an accident report, interviewed witnesses, taken statements, ordered a drug screen, and provided a panel. Thus, she testified Cracker Barrel was prejudiced by the lack of notice.

On the issue of causation, Ms. Chamberlain introduced two letters into evidence, one from her primary physician, Dr. Misty Allen, and one from Dr. Sathanandan, the neurologist she saw in the ER. Dr. Allen stated she had seen Ms. Chamberlain as a primary care patient since October 2015. She stated:

> Ms. Chamberlain had a cerebral infarction that caused significant motor and visual deficits on July 1, 2017. [She] has been diagnosed with hypertension and anxiety. Both of those conditions can worsen when under a lot of stress. Patient is currently taking medication for both of these conditions. Due to the increased stress levels at work this *could have* contributed to her elevated pressure and acute CVA. (emphasis added).

Dr. Sathanandan stated, "[S]he presented [to the ER] stating she had a meeting with a supervisor which was upsetting to her. In that meeting or soon after, [she] started having stroke symptoms. She was indeed found to have a hemorrhagic stroke in the setting of hypertensive urgency."

Ms. Chamberlain testified that she could not recall exactly what she told Dr. Sathanandan in the ER, but she knows she said it was not a quarrel. She believed that the most she would have said was that it was related to an incident involving another employee.

*Additional hearing testimony*

It was undisputed that Ms. Chamberlain has a longstanding history of high blood pressure. She testified she was diagnosed with high blood pressure when she was in her twenties. The parties introduced numerous medical records dating back to 2012, where physicians indicated her blood pressure was "uncontrolled" and/or "abnormally high." She stated that even with medication, her blood pressure has spiked. In 2013, Ms. Chamberlain saw Dr. Kevin Lokkesmore and reported she was not taking her blood pressure medication and was trying to manage it on her own. She was required to sign a waiver of treatment form for refusing to accept blood pressure medication in the office. Ms. Chamberlain explained that she refused the medication that day and has had difficulty controlling her blood pressure over the years because she is allergic to the diuretic contained in most blood pressure medications.

4

Ms. Chamberlain testified she has also taken anxiety medication for the last ten years and has reported to physicians, at times, that she believed her anxiety contributed to her high blood pressure. She also suffers from chronic nose bleeds, some of which she believed resulted from uncontrolled blood pressure.

While in the hospital, Ms. Chamberlain took FMLA leave from work. Once her leave expired, she stated she "eased back into" work at Cracker Barrel in the same position but with limited hours.

Ms. Chamberlain alleged in her Petition for Benefit Determination (PBD) that her stroke arose out of her stressful meeting with Ms. Whittington and Ms. Williquette. At the hearing, she testified it was specifically Ms. Williquette's betrayal for going back on her promise that caused her elevated blood pressure and stroke. She further testified her stroke arose out of the "culmination of six years of minor events" at work.

### Findings of Fact and Conclusions of Law

At this Expedited Hearing stage, Ms. Chamberlain must present sufficient evidence that she is likely to prevail at a hearing on the merits. *McCord v. Advantage Human Resourcing*, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-8, 9 (Mar. 27, 2015).

Cracker Barrel contended Ms. Chamberlain failed to meet the statutory requirements of a compensable injury under Tennessee Code Annotated section 50-6-102. The Court agrees.

"Injury" is defined in the Workers' Compensation Act to mean "an injury by accident, . . . arising primarily out of and in the course and scope of employment, that causes death, disablement, or the need for medical treatment." Tenn. Code Ann. §50-6-102(14)(2018). Arising primarily out of the employment means the employment must contribute more than fifty percent in causing the injury, considering all causes. That contribution must be "shown to a reasonable degree of medical certainty," meaning a physician believes the injury is work-related "more likely than not considering all causes, as opposed to speculation or possibility." *See* Tenn. Code Ann. § 50-6-102(14)(D).

The Court finds the medical proof from Drs. Allen and Sathanandan insufficient to establish that Ms. Chamberlain's stroke arose *primarily* out of her July 1 work meeting. Dr. Allen concluded her increased stress at work *could have* contributed to her elevated pressure and acute CVA. However, there is no mention of the July 1 work meeting in Dr. Allen's note to suggest she knew of the meeting Ms. Chamberlain alleged caused her stroke. Moreover, the fact that Dr. Allen believed Ms. Chamberlain's work stress "could have" contributed to her stroke is insufficient under the 2013 Reform Act to satisfy the

5

requirements of a compensable work injury.[2]

Dr. Sathanandan also did not conclude that Ms. Chamberlain's reported meeting contributed more than fifty-percent in causing her stroke, considering all causes. Cracker Barrel argued there was no indication that Dr. Sathanandan knew of Ms. Chamberlain's extensive medical history of treatment for hypertension and periods of uncontrolled high blood pressure. It further argued that her statements are merely a timeline of events, not proof of cause and effect. The Court agrees.

Cracker Barrel also contended Ms. Chamberlain's claim is barred by her failure to provide proper notice of a work injury. Tennessee Code Annotated section 50-6-201(a)(1) provides that an injured employee must give written notice of an injury within fifteen days unless it can be shown that the employer had actual knowledge of the accident or that "reasonable excuse for failure to give the notice is made to the satisfaction of the tribunal."

In support of its notice defense, Ms. Whittington credibly testified that despite several conversations with Ms. Chamberlain in the hospital, she did not learn that Ms. Chamberlain alleged her stroke was work related until June or July 2018, almost one year following the alleged incident. Because Ms. Chamberlain failed to give notice, Ms. Whittington testified Cracker Barrel was denied the opportunity to complete an accident report, interview witnesses, take statements, order a drug screen, and provided a panel. The Court finds Ms. Chamberlain did not dispute Ms. Whittington's testimony or otherwise provide any proof to rebut Cracker Barrel's notice defense. Accordingly, the Court holds she is unlikely to prevail at a hearing on the merits in light of Cracker Barrel's notice defense.

Based on the foregoing, the Court holds Ms. Chamberlain did not present sufficient proof to show she is likely to prevail at trial in meeting the requirements of a compensable work injury and rebutting Cracker Barrel's notice defense.

**IT IS, THEREFORE, ORDERED** as follows:

1. Ms. Chamberlain's claim against Cracker Barrel for the requested medical and temporary disability benefits is denied.

---

[2] Cracker Barrel also cited a pre-Reform Act Tennessee Supreme Court Panel decision to argue that employees may not recover for a stress-induced stroke where there is no "identifiable stressful, work-related event producing a sudden mental stimulus such as fright, shock, or excessive unexpected anxiety." Brown v. UPS, Inc., 2008 Tenn. LEXIS 191, *23 (Tenn. Workers' Comp. Panel April 1, 2008). However, the Court finds it need not address this argument given its holding that Ms. Chamberlain is unlikely to prevail at a hearing on the merits in meeting the requirements of a compensable work injury under the new definition of "injury" under the 2013 Reform Act.

2. **This matter is set for a telephonic Status Hearing on Wednesday, March 5, 2019, at 2:00 p.m. Central Time. You must call toll-free 855-543-5039 to participate in the hearing.** Failure to call in may result in a determination of the issues without your further participation.

**ENTERED February 14, 2019.**

**JUDGE AMBER E. LUTTRELL**
**Court of Workers' Compensation Claims**

### APPENDIX

Exhibits:
1. Ms. Chamberlain's affidavit[3]
2. Medical opinion notes from Dr. Misty Allen and Dr. S.T. Sathanandan
3. Request for Amendment of Health Information[4]
4. West Tennessee Neuroscience and Spine Center records
5. Dr. Thomas Head's records[5]
6. Physicians Quality Care records
7. Employer's Medical Records Submission
8. Employer's Supplemental Medical Records Submission
9. Spire Rehabilitation Hospital
10. Kristina Williquette's Affidavit
11. Notice of Denial

Technical record:
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Expedited Hearing
4. Order Denying Employee's Request for a Decision on the Record
5. Order Setting In Person Expedited Hearing
6. Employer's Pre-Hearing Statement
7. Employer's Witness and Exhibit List
8. Order Resetting In Person Expedited Hearing
9. Notice of Employer's Proof for Expedited Hearing
10. Employee's Witness and Exhibit List
11. Witness Subpoenas

---

[3] The Court excluded from consideration the hearsay statements in Ms. Chamberlain's affidavit attributed to physicians.
[4] The Court excluded from consideration the hearsay statements in this exhibit attributed to physicians.
[5] The Court excluded from consideration Ms. Chamberlain's handwritten notations on Dr. Head's records.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this Order was sent to the following recipients by the following methods of service on this the 14th day of February, 2019.

| Name | USPS | Email | Service sent to: |
| --- | --- | --- | --- |
| Jeanie Chamberlain, Employee | X | | P. O. Box 405, Atwood, TN 38220 |
| Catheryne Grant, Esq., Attorney for Employer | | X | catherynelgrant@feeneymurray.com |

Penny Shrum, Clerk of Court
**Court of Workers' Compensation Claims**

8